ALCAN ALUMINUM CORP. *vs.* CARLTON ALUMINUM OF
NEW ENGLAND, INC., & another.[1]

No. 92-P-223.

Middlesex. May 18, 1993. - August 18, 1993.

Present: PERRETTA. DREBEN. & GILLERMAN, JJ

*Warranty. Uniform Commercial Code*, Warranty. *Consumer Protection Act*, Warranty, Damages, Attorney's fees. *Damages*, Consumer protection case, Loss of profits. *Evidence*, Hearsay, Business record.

On a claim by a manufacturer of aluminum siding against an installer of the siding, seeking to collect the amount allegedly due for goods sold and delivered, the installer failed to prove any loss resulting from the manufacturer's breach of warranty with respect to certain siding that it purchased in 1979. [168]

Although a master properly found, and a judge properly concluded, that a manufacturer's deliberate sale of materially defective aluminum siding to an installer of the siding, when the manufacturer had good reason to believe that its product was defective, was a breach of its express and implied warranties and constituted a wilful violation of G. L. c. 93A, § 2 [168-169], the award of damages was clearly erroneous where, as to the installer's lost profits, the record contained no evidence to establish loss of profits or the amount thereof [169-171], and, as to its out-of-pocket expenses, the damages alleged were supported neither by business records nor by the testimony of a person with knowledge of the subject [171-174].

On a claim under the Consumer Protection Act, a party that proved a wilful violation of G. L. c. 93A, § 2, and an actual monetary loss resulting therefrom was entitled to recover its attorneys' fees and costs, even though the monetary loss was not quantified. [174]

CIVIL ACTION commenced in the Waltham Division of the District Court Department on April 7, 1980.

On removal to the Superior Court Department, the case was heard by *Katherine Liacos Izzo*, J., on a master's report.

---

[1]Carlton Construction, Inc.

*S. Elaine McChesney* (*Richelle S. Kennedy* with her) for the plaintiff.

*Richard L. Neumeier* (*Francis J. Harney* with him) for the defendants

GILLERMAN, J. In 1980, Alcan Aluminum Corporation (Alcan), a manufacturer of aluminum siding, brought an action in a District Court against Carlton Aluminum of New England, Inc. (Carlton[2]), an installer, to collect $23,524.38 for goods sold and delivered. Carlton removed the case to the Superior Court and filed a counterclaim for breach of express warranty, breach of implied warranties, and violation of G. L. c. 93A.[3] Eleven years later, Alcan was confronted by a final judgment awarding Carlton $3,028,354 for damages, interest, attorneys' fees and costs on its c. 93A counterclaim, and awarding Alcan $20,946.30, including interest, on its claim against Carlton.[4] Now, thirteen years after Alcan filed its complaint, we substantially reduce the judgment against Alcan, and increase the judgment against Carlton.

The case was referred to a master and a transcript of all the testimony was ordered by the judge. See *Libman v. Zuckerman*, 33 Mass. App. Ct. 341, 343 (1992). Trial by jury was waived. The trial before the master continued intermittently for twenty-two days, during which the master received two hundred and twelve exhibits. After hearings on the master's draft report, the report was settled. In the Superior Court, Alcan filed three hundred and twenty pages of

---

[2]Following the close of the hearings before the master, Carlton moved to amend its counterclaim to add as a plaintiff in counterclaim Carlton Construction, Inc., a corporation owned and controlled by the same persons owning and controlling Carlton. Alcan sold aluminum siding to both Carlton and Carlton Construction. Among the multitude of errors claimed by Alcan is the allowance of this motion in order to conform the pleadings to the evidence. There was no error.

The term "Carlton" as used in this opinion is intended to refer to both corporations, unless the context clearly indicates otherwise.

[3]Additional claims for relief by Carlton were denied by the judge. Carlton has not appealed from those rulings.

[4]Experienced lawyers often caution clients not to sue customers who refuse to pay an invoice because of a reasonable complaint about the product. This case may be cited as an illustration of the soundness of that advice.

35 Mass. App. Ct. 161                                    163

Alcan Aluminum Corp. *v.* Carlton Aluminum of New England, Inc.

objections to the master's report. The judge issued a revised master's report (the master's report), of eighty pages, together with a memorandum of decision adopting the master's report as revised, and entered the final judgment described above. Alcan appealed, and we have the entire transcript of the testimony, all the exhibits, the master's report, and the judge's rulings before us.

1. *Standards of judicial review.* The subsidiary findings of the master are binding upon us unless they are "clearly erroneous, mutually inconsistent, unwarranted by the evidence before the master as a matter of law or are otherwise tainted by error of law." Mass.R.Civ.P. 53(h)(1), as amended, 386 Mass. 1242 (1982). The scope of review is not, however, limited to accepting or rejecting the master's findings. "In actions tried to a master and without a jury, this court is free to draw its own inferences from the master's subsidiary findings . . . . It is the job of the appellate court to review for itself conclusions of law . . . . We may find facts in addition to those properly found by the master and the judge so long as not inconsistent therewith." *Melrose Hous. Authy.* v. *New Hampshire Ins. Co.*, 402 Mass. 27, 31-32 n.4 (1988).

2. *Alcan's defective aluminum siding.* The principal features of the controversy, as found by the master on sufficient evidence, may be stated in summary fashion.

The difficulty that precipitated this dispute was Alcan's sale to Carlton of defective aluminum siding which Alcan had manufactured, and the installation of that siding by Carlton on houses of its customers. The defect was not in Alcan's aluminum, but in the finish paint which Alcan purchased from Sherwin-Williams between 1972 and 1976 and applied to its white, "Deluxe" siding.

The paint problem — which produced excessive chalking on the surface of the aluminum siding — was not immediately apparent either to Alcan or Carlton. Ordinarily, excessive chalking did not appear on the surface of the siding until several years following installation. At first the complaints Alcan received (under its warranties to end users discussed below) were sporadic, but by 1975 it was evident that the

164                                35 Mass. App. Ct. 161

Alcan Aluminum Corp. *v.* Carlton Aluminum of New England, Inc.

steadily increasing volume of complaints[5] indicated a problem of significant proportions.[6] By 1975, the master found, "Alcan was aware there was an unusual problem with the white Deluxe siding, although it did not know the exact technical nature of the defect." This important information was not disclosed to Carlton.

The master found that Sherwin-Williams ceased production of the defective paint in 1976, but it was not until 1979 that Sherwin-Williams admitted to Alcan that the chalking problem was caused by an excess of the ingredient "anatase" in its paint, and it was not until then that Alcan terminated the production of the defective siding. The master found that there was defective paint in Alcan's inventory until 1979, but Carlton had received no complaints on aluminum siding purchased in 1979, and there was no finding that Carlton was damaged in any way by the 1979 shipments. The only evidence of excessive chalking on 1979 installations was that obtained by field investigation conducted by Carlton after the commencement of this litigation. The investigation turned up excessive chalking on two houses, but there is no finding as to the total number of houses installed with 1979 shipments from Alcan. On these subsidiary findings, the master inferred that *all* white aluminum siding shipped to Carlton in 1979 was defective, and gave Carlton full credit for all white aluminum siding and accessories shipped in 1979. The inference lacks adequate foundation, and the resulting credit was clearly erroneous. An additional reason for the disallowance of the credit is set forth in our discussion of "The relief awarded Carlton on Alcan's claim," *infra* at 168.

Meanwhile, Carlton began receiving complaints in or about 1974. By 1975 Carlton had received twenty-four com-

---

[5]In 1973 there were forty-one complaints to Alcan of excessive chalking on white aluminum siding; sixty-seven in 1974, one hundred and sixty-one in 1975, and three hundred and forty-five in 1976. By 1980 the complaints had swelled to 2,110. All of these complaints were verified by Alcan.

[6]Unknown to Alcan, Sherwin-Williams had made a change in the paint formulation in 1971 to cope with dirt retention problems it had previously experienced. This change, adding an extra quantity of the ingredient anatase, was the "defect" in the paint.

plaints, twenty-one complaints were received in 1976, twenty-two in 1977, twenty-four in 1978, thirty-six in 1979, and twenty-seven in 1980. Carlton directed all of the complaints it received to Alcan. Carlton was also obliged to respond to customer complaints and lawsuits, and incurred costs and expenses in doing so. The master also found that these complaints and lawsuits threatened Carlton with loss of reputation and loss of market share. See note 13, *infra.* The master found, however, that "Carlton presently has a good reputation and has not suffered a loss of reputation due to its own efforts at mitigating this damage."

At first Carlton complained to Alcan's area representatives, but on September 27, 1977, William C. Anglin, an officer and one of the owners of Carlton, wrote Roy A. Gentles, president of Alcan Building Products (apparently a division of Alcan), complaining of the poor quality of the white aluminum siding during the previous years. While admitting to knowledge of the problem early in 1976, Gentles answered on October 18, 1977, that Alcan had taken "immediate steps to correct it." He assured Carlton that all complaints would be handled "promptly and reasonably." The master found that this letter did not disclose the "true nature and extent of the problem known to Alcan at that time. . . ." In December, 1977, a vice president of Alcan also wrote Carlton acknowledging that Alcan had "sole and complete responsibility to refinish Alcan siding on any homeowner complaint inspected by an Alcan representative and acknowledged to be defective under the terms of our Warranty Certificate."

While Carlton's purchases of white aluminum siding were not terminated until the spring of 1979, its purchases of Alcan's aluminum siding, after peaking in 1976 at $269,951, sharply declined in 1977 to $87,723, $23,455 in 1978, and $5,986 in 1979. Beginning in 1975, in response to the problems with Alcan's aluminum siding, Carlton began switching its business to the installation of vinyl siding which it purchased from other manufacturers. In 1976 vinyl sales were ten percent of Carlton's total sales; in 1977, thirty-one

166                                               35 Mass. App. Ct. 161

Alcan Aluminum Corp. *v.* Carlton Aluminum of New England, Inc.

percent; in 1978, eighty-two percent, and beginning in 1979, approximately ninety-six percent. This changeover anticipated the national trend toward vinyl in siding for houses.

3. *The warranties of Alcan and Carlton.* From 1965 to 1979, Alcan provided Carlton with written warranties of its aluminum siding for distribution to Carlton customers. The warranties were modified from time to time, but, in substance, they provided that the siding would be free of defects for a period of thirty years, and if defects did appear during the thirty years, Alcan would replace or refinish the siding. If a defect appeared in the first two years, there would be no charge to the customer; thereafter the charges would be shared by the customer and Alcan in proportion to the age of the siding (the prorated warranty). Alcan's warranty also limited its liability to the remedies just described.

The master found that Alcan's warranties, including its advertisements, were "directed" to Carlton's customers. We take this to mean that Alcan's warranties were binding upon and intended for the benefit of Carlton's customers, not Carlton. So construed, the finding is justified by the record.

In addition to Alcan's warranties, Carlton offered its customers, when necessary to close a sale, a twenty-year written, unconditional guarantee which, the master found, Carlton issued in reliance upon Alcan's reputation and its warranties to Carlton customers.

The master also found that Alcan gave an express warranty to Carlton with respect to its aluminum siding: "[Alcan], through its sales representatives, [gave] express warranties to Carlton that it would back up its materials one hundred per cent." The master made no finding as to when the warranty was given, but the record supports a finding, not inconsistent with the master's findings, that the warranty was made "from day one" of the relationship between Alcan and Carlton, and repeatedly thereafter.

An express warranty includes a "promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain. . . ." G. L. c. 106, § 2-313(1)(*a*), as appearing in St. 1957, c. 765, § 1. While the

testimony on the point did not achieve the clarity or precision one would choose to see, we are unable to say that the finding of an express warranty was clearly erroneous. Alcan argues only that the statement is too vague to constitute an express warranty. See Hannon v. *Original Gunite Aquatech Pools, Inc.*, 385 Mass. 813, 823 (1982) ("seller's talk" or "puffing" does not create express warranties). Taken in the context of Alcan's limited, prorated warranty, and Carlton's decision to provide its own unlimited warranty to prospective customers when needed to close a sale, Alcan's unlimited express warranty was of critical importance to Carlton. It filled the gap between Alcan's prorated liability to Carlton's customers and Carlton's unlimited liability to its customers, leaving Carlton without exposure except with regard to its own labor in installing the siding. Thus Carlton could reasonably have understood Alcan to mean that as between Alcan and Carlton, Alcan gave its full, unlimited warranty with regard to the aluminum siding sold to Carlton. It was on that understanding that Carlton gave its unconditional warranty to its customers. This understanding was confirmed in Alcan's letter of December, 1977, in which, as we previously noted, Alcan acknowledged its "sole and complete responsibility" to remedy all customer complaints about the defective siding.

Finally, the master found that the defective siding, which Alcan sold to Carlton from 1972 through 1979, was a breach of Alcan's implied warranty, and the judge subsequently identified the warranty as that of merchantability, see G. L. c. 106, § 2-314.[7] A breach of an implied warranty of merchantability is a violation of G. L. c. 93A, § 2. See *Burnham* v. *Mark IV Homes, Inc.*, 387 Mass. 575, 581 (1982); *Maillet* v. *ATF-Davidson Co.*, 407 Mass. 185, 193 (1990).[8]

---

[7]The judge incorrectly ruled that the implied warranty extended for fifteen years. See *New England Power Co.* v. *Riley Stoker Corp.*, 20 Mass. App. Ct. 25, 27 n.4 (1985).

[8]Because of the conclusions we reach with regard to the failure of proof of Carlton's damages, we need not discuss statute of limitations issues argued by Alcan. We note, however, that no testimony was offered by Carl-

4. *The relief awarded Carlton on Alcan's claim.* On Alcan's claim against Carlton for siding sold and delivered in 1979, the master allowed a credit for "all invoiced shipments of white deluxe Alcan siding and accessories." The credit given Carlton for all the 1979 shipments of white aluminum siding it received is based on the inference drawn by the master that *all* the 1979 shipments of white aluminum siding were defective. (The reasons for the failure of this inference are discussed above in part 2.)

Where goods have been accepted, and notice of breach of warranty given, the buyer is entitled to "the loss resulting in the ordinary course of events from the seller's breach. . . . G. L. c. 106, § 2-714(1), as appearing in St. 1957, c. 765, § 1. If it be assumed that Carlton gave adequate notice of breach of warranty, it failed to prove any loss resulting from that breach. The master found that Carlton's field investigation revealed two homes with siding installed by Carlton in 1979 which exhibited excessive chalking, but there was no finding that Carlton suffered any loss in connection with those installations or from any other installation of siding purchased in 1979. (Indeed, as we noted above, the master found that Carlton had received no complaints about its 1979 installations.) Thus, there was no legal or factual basis for the one hundred percent credit for all white aluminum siding delivered to Carlton in 1979, and the allowance of the credit was error.

5. *The relief awarded Carlton on its counterclaim.* The master found, and the judge concluded, each with sufficient justification, that Alcan's deliberate sale of materially defective siding to Carlton until early in 1979, when Alcan at

---

ton which suggested that the Alcan express warranty was coextensive with the written thirty-year warranty given by Alcan to Carlton's customers. Absent an explicit agreement between the parties with regard to the duration of the warranty, we conclude that, at least as between experienced business persons, the duration of this contract-based express warranty is no longer than that permitted by the applicable statute of limitations, namely, four years from delivery. See G. L. c. 106, § 2-725(2); *Wilson* v. *Hammer Holdings, Inc.*, 850 F.2d 3, 5-6 (1st Cir. 1988) (construing Massachusetts law). See also *Bay State-Spray & Provincetown S.S., Inc.* v. *Caterpillar Tractor Co.*, 404 Mass. 103, 106-109 (1989).

least as early as 1975 had good reason to know that its product was defective, was adequate to support the conclusions that (i) Alcan had committed a breach of its implied and express warranties to Carlton, thereby violating G. L. c. 93A, § 2, see *Linthicum* v. *Archambault*, 379 Mass. 381, 387 (1979); *Maillet* v. *ATF-Davidson Co.*, 407 Mass. at 193, and that (ii) these deliberate breaches by Alcan constituted wilful violations of c. 93A, § 2. See *Shaw* v. *Rodman Ford Truck Center, Inc.*, 19 Mass. App. Ct. 709, 711-712 (1985). Carlton thus became entitled to multiple damages, attorneys' fees, and costs under § 11 upon proof of the loss of money or property. See *Calimlim* v. *Foreign Car Center, Inc.*, 392 Mass. at 235; *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 475 (1991).[9] The remaining question is whether Carlton proved it was damaged by these violations.

a. *Lost profits.* Consequential damages, including lost profits, arising from a breach of warranty are recoverable in a proper case. See G. L. c. 106, § 2-714(3), and § 2-715(2)(a); *Delano Growers' Coop. Winery* v. *Supreme Wine Co.*, 393 Mass. 666, 683 (1985).

Carlton's economic expert, David Sheridan, testified to Carlton's lost profits. Sheridan compared Carlton's aluminum sales to the industry's national aluminum shipments to project what Carlton's sales and profits (calculated at eleven percent of sales, which the master found to be reasonable)

---

[9]The master found that the breaches were the proximate cause of damages to Carlton, consisting of (i) out-of-pocket expenses of $192,866.40, and (ii) lost profits of $218,469: she totaled these at $411,362.40, with interest from the date of the commencement of the action. The master also concluded that Alcan had knowingly and wilfully violated G. L. c. 93A, §§ 2 and 11, and Carlton was therefore entitled to multiple damages, as well as attorneys' fees and costs.

Because of Alcan's wilful and knowing violations of § 2, the judge trebled the damages to $1,234,223.40. Interest on that amount from April 30, 1980, was $1,632,877.50, and the judge, after denying Alcan's motion for a hearing on attorneys' fees, awarded Carlton $150,105 in attorneys' fees, and costs of $11,139.29. The judge ordered all recovery to be awarded under the 93A count, foreclosing the possibility of duplicative recovery. See *Calimlim* v. *Foreign Car Center, Inc.*, 392 Mass. 228, 235-236 (1984).

The figures recited above are taken from the record and minor mathematical errors have not been corrected.

would have been had Carlton performed as well as the industry average. The master rejected Sheridan's analysis because "Mr. Sheridan . . . did not look at Carlton's vinyl siding sales . . . which Carlton Aluminum sold for the phase-in period, along with aluminum. [Therefore] I find this analysis is unreliable."[10]

In response to Sheridan's testimony Alcan introduced exhibit 190 which, for the years 1976 throughout 1987, compared Carlton's total sales of both aluminum and vinyl (expressed in square feet ["squares"]) to the volume of aluminum sales Sheridan said Carlton would have achieved if it had performed as well as the industry average. The exhibit revealed that by switching to vinyl Carlton sold a total of more squares in each year (but one) than it would have sold with a defect-free, exclusively aluminum product. Exhibit 190 then multiplied the average annual selling price per square by the incremental gain (or loss) in squares sold in each year. The resulting dollar amount (representing the incremental gain in sales expressed in dollars) was then multiplied by Sheridan's approved eleven percent rate of return to yield the net profit derived from the *incremental gain* in sales. The total for the years examined was $364,531. Exhibit 190, then, is also evidence of Carlton's successful efforts to prevent loss to it, as required by G. L. c. 106, § 2-715(2)(*a*).

The master found exhibit 190 "to more accurately reflect Carlton's sales insofar as sales of vinyl are included." In addition, the master observed that although Carlton showed "profit in any particular year does not mean that it did not suffer lost profits." Thereupon the master reached the follow-

---

[10]From 1975 through 1981 Carlton was selling both aluminum and vinyl siding. See text, *supra* at 165-166, for detailed information concerning the growth of Carlton's vinyl sales. The master rejected Sheridan's lost profit calculation for the additional reason that to retain the lost aluminum sales while expanding its vinyl sales would have required substantial additional expense for "increase[d] sale[s] force, installation price, equipment costs, clerical staff, warehouse space, advertising costs and office space," which, the master found, Sheridan did not take into account. Thus there was no evidence and no finding that Carlton would have made *any* profit had it achieved industry average aluminum sales while expanding its vinyl sales.

35 Mass. App. Ct. 161                    171

Alcan Aluminum Corp. *v.* Carlton Aluminum of New England, Inc.

ing general finding: "I find that as a minimum, Carlton would have made at least the same amount over and above the amounts shown in exhibit 190. Therefore I find these figures to represent 'lost profits.' "

The master limited the period of lost profits to the years 1976 through 1982.[11] The total for that period was $218,469.

The master's finding of lost profits is clearly erroneous. Quite aside from the fact that exhibit 190 did *not* show Carlton's historic "profits" for the indicated years,[12] there is nothing in the subsidiary findings of the master, nor, indeed anything else in the record which we can find or which Carlton's brief identifies, which provides a rational basis for the conclusions that (i) Carlton suffered lost profits, and (ii) that Carlton's "lost profits" were not less than its "profits." See *Hendricks & Assocs.* v. *Daewoo Corp.*, 923 F.2d 209, 217-220 (1st Cir. 1991) (reviewing Massachusetts cases, and disallowing claim of lost profits because of the absence of any rational basis for the award). See also *Stark* v. *Patalano Ford Sales, Inc.*, 30 Mass. App. Ct. 194, 202 (1991) ("When . . . damages are sought they must be proved and not left, as here, to speculation," quoting from *Snelling & Snelling, Inc.* v. *Wall*, 345 Mass. 634, 636 [1963]). We conclude that the finding of lost profits was clearly erroneous.[13]

b. *Out-of-pocket expenses.* In addition to its claim to lost profits, Carlton claims substantial damages for out-of-pocket

---

[11]The master found that 1982 was the end of the period of lost profits because that was the year Carlton Aluminum ceased operations and the year that "the New England market was shifting to vinyl."

[12]Exhibit 190 shows Carlton's incremental gain in profits (derived from its actual sales of both aluminum and vinyl) in excess of hypothetical profits that Carlton would have earned if it had sold only aluminum siding and had performed as well as the aluminum industry for the years involved.

[13]The master also found that "there was not a quantifiable loss of good will to Carlton," and that Carlton "has a good reputation and has not suffered a loss of reputation due to its own efforts at mitigating . . . damage[s]." The additional findings — that Carlton "suffered a threat to reputation for which it incurred damages" — must yield to the fact that no quantifiable damages were shown in this case. See discussion at part b, "Out-of-pocket expenses," *infra.*

172                                    35 Mass. App. Ct. 161

Alcan Aluminum Corp. *v.* Carlton Aluminum of New England, Inc.

expenses. See G. L. c. 106, § 2-715(1). The master allowed expenditures to the extent of $192,866.40, which the judge adopted, and then tripled.

The master's award was based largely on exhibit 180 which was admitted in evidence over Alcan's objection. Exhibit 180 is a five-page,[14] handwritten, four-column worksheet. The items listed are not described other than by name; there are numerous strike-overs and deletions. The total appears to be $444,464.79 of which the master, as we have said, accepted less than one-half, but without explanation for the excluded items.

The included items may be divided into four categories: (i) "administrative [$60,600], field inspection [$45,450], and miscellaneous [$30,300]" costs incurred by Carlton in connection with customer complaints; (ii) attorneys' fees paid in connection with the defense of claims asserted against Carlton on its unlimited guarantees to customers; (iii) funds Carlton paid to its customers by reason of its own guarantee; and (iv) all remaining items, which are fees and expenses paid in connection with the prosecution of this lawsuit. Category (iv) is plainly not an item of damages which may be tripled (although it might be included in the award of attorneys' fees and costs, discussed below), and requires no further discussion.

The master made no findings with regard to the circumstances attending exhibit 180, but there was testimony that the initial draft was prepared by litigation counsel together with William C. Anglin (Anglin Sr.) in anticipation of the trial in this case. Subsequently it was revised by his son William T. Anglin (Anglin Jr.). Anglin Jr. had no personal knowledge of the content of exhibit 180. He testified that he was the keeper of the records of Carlton in spite of the fact that he was employed full-time at another company from 1968 to 1984.

Carlton argues that exhibit 180 is admissible because Anglin Jr. testified that the numbers appearing in the exhibit

---

[14]The document refers to page 6, but that page does not appear in the record.

came "from the records of Carlton." The records of Carlton were never admitted in evidence, however. It is undisputed that exhibit 180 was not a business record of Carlton, and that G. L. c. 233, § 78, is inapplicable. See *DiMarzo* v. *American Mut. Ins. Co.*, 389 Mass. 85, 105-106 (1983).[15] Carlton also argues that exhibit 180 is admissible because "Anglin Sr. knew what his operating costs were." That may be true, but it does not prove Carlton's claim to damages through admissible evidence. *Delano Growers' Coop. Winery* v. *Supreme Wine Co.*, 393 Mass. at 678-679 nn.5 & 6, to which Carlton also cites, is equally unhelpful to Carlton.

There are further difficulties with exhibit 180. Anglin Jr. testified that the costs for administration ($200 per complaint), field inspection ($150 per complaint) and miscellaneous ($100 per complaint), were estimates told to him by Anglin Sr. Exhibit 180 then multiplies each of these costs by 303, the total number of complaints Alcan received from Carlton customers on *all* siding shipments, not merely white aluminum siding shipments. We have previously noted, and we emphasize here, that the master found that Carlton referred all customer complaints to Alcan. Further, Anglin Sr., who earlier in the trial was called as a witness, did not testify to the estimates of cost attributed to him. Anglin Jr. was unable to testify to the basis or accuracy of the estimates for he had no personal knowledge of the subject. There was no evidence offered to support the estimates made by Anglin Sr., and again, critical assertions by Carlton were placed beyond the reach of cross-examination.

The remaining two categories — payments to Carlton customers and payment to attorneys in connection with complaints — share the same defects. They were not supported by the business records of Carlton, or the testimony of any

---

[15]Carlton cites only to *Fortin* v. *Ox-Bow Marina, Inc.*, 408 Mass. 310, 315-316 (1990), where the court observed that findings by a judge, especially those based on oral testimony, will not be disturbed unless clearly erroneous. *Fortin* provides no assistance to Carlton in overcoming the hearsay objection to exhibit 180.

person having knowledge of the subject. Contrast *Commonwealth* v. *Greenberg*, 339 Mass. 557, 581-582 (1959).

We conclude that exhibit 180 was erroneously admitted in evidence, and the award of out-of-pocket expenses based on that exhibit was clearly erroneous.[16]

c. *Attorneys' fees and costs.* There remains the matter of Carlton's attorneys' fees and costs. While Carlton was unable to quantify its costs attributable to the defective siding it purchased from Alcan, there is sufficient evidence in the record to conclude that Carlton did suffer an actual loss of money or property — by responding to customer complaints and lawsuits about the defective siding — such as would entitle it to the award of attorneys' fees and costs. See *Jet Line Servs., Inc.* v. *American Employers Ins. Co.*, 404 Mass. 706, 718 (1989) (plaintiff suing under § 11 may be entitled to attorneys' fees even if the adverse effect upon the plaintiff is not quantifiable in dollars).[17] The denial of Alcan's demand for a hearing on Carlton's motion for counsel fees was not error. See *Heller* v. *Silverbranch Constr. Corp.*, 376 Mass. 621, 628-631 (1978).[18]

6. *Conclusions.* For the reasons stated, the judgment must be reversed. A new judgment is to be entered awarding Alcan $23,524.38 and interest on its complaint, and, on Carlton's 93A counterclaim, awarding Carlton its attorneys' fees, $150,105, and costs, $11,139.29. Carlton's request for fees and costs on appeal is denied.

*So ordered.*

---

[16]The master also cited exhibit 142 in connection with the award of damages for costs. That exhibit is a projection of expenses on the assumption that Carlton — not Alcan — had replaced *all* of the Alcan siding Carlton had installed between 1972 and 1976. There was no evidence that this work was actually performed by Carlton.

[17]The fact that Carlton suffered damages, but failed to prove the amount, is not an occasion to remand the case to the master for further hearings. See *Stark* v. *Patalano Ford Sales, Inc.*, 30 Mass. App. Ct. at 203.

[18]There were numerous additional arguments raised in the briefs of the parties, but in view of the reasoning and the result set forth in the text, none requires discussion beyond that stated in this opinion.