USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1010

 ARTHUR D. LITTLE, INC., 
 ARTHUR D. LITTLE INTERNATIONAL, INC.,

 Plaintiffs, Appellees,

 v.

 DOOYANG CORPORATION, 
 DOOYANG AMERICA, INC., 
 DOOYANG INTERNATIONAL, INC.,

 Defendants, Appellants.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Patti B. Saris, U.S. District Judge]

 Before

 Torruella, Chief Judge,
 
 Selya and Lynch, Circuit Judges.
 
 

 Robert L. Weigel, with whom Gibson, Dunn & Crutcher, John A.
Donovan, Jr., and Burns & Levinson were on brief, for appellants.
 Peter J. Macdonald, with whom Charles P. Kindregan and Hale &
Dorr were on brief, for appellees.

June 25, 1998

 
 

 LYNCH, Circuit Judge. This case demonstrates the high
costs Massachusetts imposes on businesses which engage in unfair or
deceptive trade practices prohibited by Mass. Gen. Laws ch. 93A. 
The legal question raised here, one of first impression for this
court, is whether when one business engages in unfair and deceptive
practices towards another and the harm consists of a delay in
payments owed (and the usual accompanying expenses), that is a
"loss of money or property" establishing a violation under Mass.
Gen. Laws ch. 93A, 11. The high costs imposed are that the
damages awarded are not those attributed solely to the nonpayment
but rather may be multiples of the amount of payments originally
owed.
 Guided by the decisions of the courts of Massachusetts,
as we must be in this diversity case, we answer this question in
the affirmative and affirm the judgment of the district court. We
resolve the "loss of money or property" issue and the other issues
against appellants Dooyang. For Dooyang's failure to pay invoices
totaling $460,000, the jury and court awarded Arthur D. Little
$920,000 in damages, plus interest, plus over a million dollars in
attorney's fees and costs.
 I.
 Two large international companies, each unhappy with its
dealings with the other, and each with some justification for that
unhappiness, are involved in this litigation. We review the facts
"as the jury and district court could have found them." Cambridge
Plating Co. v. Napco, Inc., 85 F.3d 752, 756 (1st Cir. 1996). 
"Where specific findings are lacking, we view the record in the
light most favorable to the ruling, making all reasonably supported
inferences." Roche v. Royal Bank of Canada, 109 F.3d 820, 821 (1st
Cir. 1997) (citation and internal quotation marks omitted).
 ADL is an international consulting firm with its home
office in Cambridge, Massachusetts. ADL has an office in Caracas,
Venezuela. Dooyang is an industrial conglomerate with headquarters
in Seoul, South Korea. Dooyang hired ADL from 1988 to 1991 to
assist it in a conceptualized aluminum smelter project. Though
projects in other countries were initially considered, Dooyang soon
instructed ADL to focus on opportunities for building a new smelter
in Venezuela.
 At the outset, ADL informed Dooyang that it also worked
for the Corporacion Venezolana de Guayana ("CVG"), an arm of the
Venezuelan government responsible for awarding valuable "debt-
equity swap" subsidies, and for the Venezuelan minister responsible
for energy and metal production. ADL was assisting CVG to attract
investment in Venezuela. Acquisition of the debt-equity swap
subsidies awarded by CVG was thought to be the key to the success
of a smelter project in Venezuela. Dooyang consented to this
conflict, apparently believing that ADL's insider influence would
redound to Dooyang's benefit. In March of 1989, ADL recommended
that Dooyang invest in the construction of a new smelter rather
than join an existing project. 
 Soon after, and wearing its other hat, ADL met with CVG
to assist it in attracting international investment in the
Venezuelan aluminum industry, and contracted with CVG to evaluate
the relative merits of various aluminum smelter proposals. 
Obviously, one of the proposals ADL could end up evaluating was
that of its other client, Dooyang.
 In June of 1989, ADL and Dooyang entered into the first
in a series of agreements under which ADL would assist Dooyang in
developing a new smelter. ADL pledged to use its "best efforts" to
assist Dooyang in a wide variety of areas, including assembling the
necessary financing and technical support, and lobbying the
Venezuelan government on Dooyang's behalf. ADL evaluated and
selected advisers and partners in the project. At no time,
however, was ADL empowered to enter into contracts or make other
commitments on Dooyang's behalf.
 In its other capacity, ADL advised CVG in July of 1989 to
seek an investor which had the capacity to develop a smelter
without partners. ADL advised CVG to focus on projects by ALCOA
and ALUMAX, and to consider as a third possibility either
Cisneros/Rich or Austria Metall. Dooyang could not develop a
smelter by itself, but had to enter into partnerships with other
companies. At this point, however, Dooyang had not decided to go
forward with a project in Venezuela, and so had no proposal then
for consideration. But that changed: in January of 1990, Dooyang
and CVG entered into an agreement which stated Dooyang's intent to
build a smelter in Venezuela.
 The contract between ADL and Dooyang was to expire by its
terms at the end of 1989. ADL and Dooyang agreed to extend the
contract for an additional six months in January of 1990. During
1990, ADL also represented CVG in negotiations with other potential
investors such as ALCOA. Dooyang was aware that ADL's work for CVG
involved contacting other competing investors. ADL and Dooyang
agreed to a third six-month extension of the contract in July of
1990. 
 In April of 1990, ADL compared for CVG the relative
merits of three smelter project proposals by ALCOA, Dooyang, and
ALUMAX. ADL stressed that ALCOA was the only company capable of
proceeding with a smelter on its own. ADL recommended that CVG "be
more aggressive" with ALUMAX in order to keep its interest. With
regard to Dooyang, ADL said that Dooyang was "serious about the
project" and that they were "spending major funds to advance their
position," and that ADL was "confident that they will continue to
move very rapidly." ADL later reiterated to CVG that because ALCOA
had all of the needed elements "in house," great effort should be
expended to realize the ALCOA project. In a July 1990 report, ADL
identified the ALCOA and ALUMAX projects as the "focus" projects,
and stated that Dooyang was "one of the leading projects."
 Dooyang was aware that ADL was evaluating competing
projects for CVG. ADL provided Dooyang with partial copies of its
presentations to CVG, and assured Dooyang that ADL had convinced
CVG "that the Dooyang project is the number one project to
support." Dooyang submitted its project proposal and bid for
subsidies from the Venezuelan government in December of 1990. 
Dooyang and its equity partners proposed building a smelter on the
Orinoco river, dubbed the "Orinoco project." CVG rejected
Dooyang's Orinoco project application in March of 1991 in favor of
the ALCOA project.
 Dooyang met with ADL in Caracas to discuss resubmitting
the proposal. In early 1991, ADL and Dooyang again extended the
letter agreement. At least by April 20, 1991, as the district
judge subsequently found, Dooyang decided not to pay ADL. Dooyang
felt that ADL should do the work on the second subsidy application
for free because Dooyang had spent millions on this project with no
result. Dooyang did not inform ADL that it expected ADL to
continue working for no compensation, and Dooyang continued to
request ADL's services after it had decided not to pay for them. 
 The Dooyang Orinoco project proposal was resubmitted on
April 26, 1991. In June, the Venezuelan government approved the
project, and in July it awarded subsidy rights to Dooyang as well
as to a third company. Dooyang thanked ADL for its assistance, and
did not further extend its contract with ADL. The smelter was
never built. Dooyang's major partners pulled out of the project,
and the collapse of the Soviet Union triggered a plunge in aluminum
prices which rendered the project economically infeasible then. 
Dooyang had incurred over $9 million in costs connected to the
Orinoco project. ADL had been paid over $2.2 million for its work.
 ADL had worked from March through June of 1991, and
billed Dooyang approximately $460,000 for these services. It is
the invoices for this work which were not paid and became the
subject of a breach of contract claim. It is how Dooyang behaved
in not paying the bills which became the basis for the unfair and
deceptive trade practices claim. 
 Dooyang repeatedly promised to pay the outstanding ADL
invoices, though it had no intent to do so. Dooyang falsely blamed
the hold-up in payment on bureaucratic delays and supposed problems
with currency regulations. After ADL inquired about the unpaid
invoices, Dooyang provided ADL with a letter stating that Dooyang
was "sorry for your inconvenience caused by the delay of payment,
and . . . appreciate[d] . . . your kind understanding of the time
consuming procedure." The letter stated that the outstanding
balance would be settled by the end of October 1991 at the latest.
 In late October 1991, ADL again insisted on payment and
Dooyang replied that the invoices would be settled by "December
1991/January 1992." In a November 1991 meeting in ADL's Cambridge
offices, Dooyang agreed to pay the outstanding invoices by January
1, 1992. Dooyang missed that deadline, and ADL again made repeated
inquiries about payment. 
 Finally, Dooyang sent a letter to ADL's Cambridge office
in March of 1992 stating that Dooyang had "no intention to delay or
discard the payment" and promised to pay starting in January of
1993. The letter assured ADL that "[a]ll outstanding payment will
be cleared up no later than June 30, 1993 at the latest." Dooyang
missed that deadline, and an ADL executive contacted the President
of Dooyang directly, who professed to be unaware of the problem. 
Dooyang again promised to pay ADL by June of 1993. Once again,
Dooyang missed the deadline.
 Even while Dooyang was falsely promising to pay ADL and
its other creditors, it continued to exploit the benefits of their
unpaid work. Dooyang continued to pursue the smelter project, and
as late as August of 1994, Dooyang was dealing directly with CVG
and expressing "keen interest" in pursuing the project. It still
did not pay ADL.
 Dooyang's dissembling was part of its deliberate strategy
on the Orinoco project. Dooyang's strategy was to force its
creditors to accept deeply discounted payments by forcing them to
litigate to collect on their bills. This was not a matter of
inference. Dooyang said as much in its business documents. In its
internal 1992 Business Report, Dooyang stated that it had been
"delaying accounts payable associated with the Orinoco project by
all possible means." The Business Report included a chart listing
each of Dooyang's advisors on the Orinoco project, followed by a
column titled "ACCOUNT PAYABLE" listing the amounts Dooyang owed
them, and another, blank column titled "Settlement" for listing the
amounts to which Dooyang was able to reduce the fee through its
delaying tactics. Other advisors on the project also had to resort
to litigation to recover their unpaid fees after receiving similar
empty promises about the payment of outstanding bills. Not one of
Dooyang's five largest creditors was paid anything without first
resorting to litigation.
 The district court found that Dooyang made repeated
written intentional representations to ADL concerning its intent to
pay the invoices, and found that from at least April 20, 1991,
Dooyang had no intent to pay ADL. The district court found that,
once the project began to founder, "Dooyang abandoned any intent to
pay any consultants, including ADL, made false representations
about intent to pay, never had any good faith basis for delaying
payment, and intended to force ADL to litigate as leverage to force
a favorable settlement." ADL II, 979 F. Supp. at 924.
 II.
 ADL sued Dooyang in Massachusetts state court in August
1994 on theories of breach of contract, fraud, and unfair and
deceptive trade practices in violation of Chapter 93A. Dooyang
removed the case to federal court in September 1994. Dooyang
counterclaimed, arguing that it did not have to pay ADL. Dooyang
alleged that ADL fraudulently induced it to enter into the
consulting agreements and made continuous fraudulent and negligent
misrepresentations, that ADL failed to provide Dooyang with
"accurate and complete information" about the smelter project in
Venezuela, that ADL breached its contract because it failed to use
its "best efforts," and that ADL violated Chapter 93A through
unfair or deceptive business practices. Dooyang's counterclaims
were based on ADL's work for the Venezuelan government and
Dooyang's perception that ADL was duplicitous.
 The district court granted ADL's motion for summary
judgment on Dooyang's Chapter 93A claim. ADL voluntarily dismissed
its fraud claims on the eve of trial. After a jury trial on the
remaining claims and counterclaims, except ADL's Chapter 93A claim,
the jury found, after two days of deliberation, in favor of ADL on
its breach of contract claim and awarded it $460,000 in damages
(the full amount of its bills for services rendered from March to
June 1991).
 As to the Chapter 93A claim (triable to the court under
Massachusetts law), the district court concluded that ADL had
proved that Dooyang engaged in "unfair or deceptive acts or
practices." These acts or practices were: Dooyang's ordering
consulting services without intending to pay for them, Dooyang's
expressing intent to pay ADL when it had no intent to do so, and
Dooyang's strategy of "commercial extortion" by which it attempted
to force favorable price concessions through the threat of
litigation. See ADL II, 979 F. Supp. at 925. Under Chapter 93A,
the unfair or deceptive conduct must "occur primarily and
substantially within Massachusetts" to be actionable. The court
ruled that only Dooyang's conduct in misleading ADL about paying
its bills was a 93A violation, because this conduct occurred in
Massachusetts. See id. Because the violation was willful, the
court doubled ADL's damages to $920,000 plus statutory interest. 
See id. at 927-28.
 III.
 Dooyang raises two issues on this appeal. Dooyang first
contends that the special verdict form improperly precluded
consideration of Dooyang's counterclaims. Second, Dooyang argues
that the district court misapplied the law in holding that
Dooyang's false promises to pay ADL constituted a Chapter 93A
violation.
A. The Special Verdict Form
 Dooyang argues that the district court improperly
precluded consideration of its counterclaims by instructing the
jury to consider Dooyang's counterclaims only if it found that ADL
had failed to prove that Dooyang "materially breached its contract
to pay for services provided by ADL without legal excuse" (emphasis
added). According to Dooyang, the district court improperly
collapsed the whole of Dooyang's counterclaims into the phrase
"without legal excuse."
 The parties dispute whether Dooyang properly objected to
the verdict form. Where there has been a proper objection to a
claimed error in a special verdict form, our review is for an abuse
of discretion. See Transamerica Premier Ins. Co. v. Ober, 107 F.3d
925, 933 (1st Cir. 1997). But where there is no objection, our
review is for plain error only. See Cambridge Plating Co., 85 F.3d
at 767. Because even under the less deferential abuse of
discretion standard there was no error, we do not decide whether
Dooyang's somewhat vague objection was adequate to preserve the
claim.
 Under the abuse of discretion standard, we examine the
jury instructions as a whole to determine whether they confused or
misled the jury on the applicable law. See Tatro v. Kervin, 41
F.3d 9, 14 (1st Cir. 1994). We assume the jury listens to and
follows the judge's entire charge. See United States v. Gonzalez-
Gonzalez, 136 F.3d 6, 9 (1st Cir. 1998). Nonconstitutional errors
in a civil suit are harmless if it is probable that the error did
not affect the outcome of the case. See Moulton v. Rival Co., 116
F.3d 22, 26 (1st Cir. 1997); see also Putnam Resources v. Pateman,
958 F.2d 448, 456 (1st Cir. 1992) ("[A] district court has wide
discretion in constructing and utilizing verdict forms." (citations
omitted)).
 The district court's jury instructions made clear the
burden ADL had to meet to prove that Dooyang breached the contract
"without legal excuse." The court instructed the jury at length
that ADL had to prove the elements of its breach of contract
claim. In addition, the court made it clear that it was ADL's
 burden to show that Dooyang did not have any "legal excuse" for its
 non-payment. 
 In fact, Dooyang was the beneficiary of this instruction. 
 The effect of the "without legal excuse" language was to shift the
 burden of proof on Dooyang's claims from Dooyang to ADL. ADL was
 required to disprove Dooyang's counterclaims to prevail on its
 breach of contract claim. Because Dooyang presented its
 counterclaims as defenses to ADL's breach of contract claim, it was
 relieved of the burden of proving its assertions. See ADL I, 928
 F. Supp. at 1205. Instead, ADL had the burden to prove that
 Dooyang's failure to pay the 1991 bills was "without legal excuse." 
 The instructions on "legal excuse" make it clear that Dooyang did
 not have to pay ADL if Dooyang's counterclaims had merit. 
 Because the case involved a single contract, the jury
 could not have found both in ADL's and Dooyang's favor. Because
 the jury found in ADL's favor, it necessarily rejected Dooyang's
 counterclaims. There was no abuse of discretion in the format of
 the verdict form.
 B. The Chapter 93A Violation
 Dooyang's second claim of error is that the district
 court misapplied the law of Chapter 93A. Dooyang's argument has
 two components: first, that its actions were not "unfair or
 deceptive," and second, that those actions did not, in any event,
 cause a "loss of money or property." We review the district
 court's findings of fact for clear error and its conclusions of law
 de novo. See Cambridge Plating Co., 85 F.3d at 769. "Although
 whether a particular set of acts, in their factual setting, is
 unfair or deceptive is a question of fact, the boundaries of what
 may qualify for consideration as a [Chapter] 93A violation is a
 question of law." Ahern v. Scholz, 85 F.3d 774, 797 (1st Cir.
 1996) (citation and internal quotation marks omitted).
 Our review is of the district court's finding that the
 "second act of deception," Dooyang's continual promises to pay ADL
 when it had no intent to do so as part of a strategy to force its
 creditors to accept discounted settlements, constituted a violation
 of Chapter 93A. Under Chapter 93A, the act or practice must be
 "unfair or deceptive," must occur "primarily and substantially" in
 Massachusetts, and must cause a loss of "money or property." Based
 on our review of the evidence, we find that the district court's
 findings of fact are not clearly erroneous and we will not disturb
 them. We agree with the district court that Dooyang's "second act
 of deception" qualifies as a Chapter 93A violation.
 1. Unfair or Deceptive
 Under 2 and 11 of Chapter 93A, it is unlawful for
 those engaged in trade or commerce to employ "unfair methods of
 competition and unfair or deceptive acts or practices" in business
 transactions with others engaged in trade or commerce. Chapter 93A
 "was designed to encourage more equitable behavior in the
 marketplace and impose liability on persons seeking to profit from
 unfair practices." Linkage Corp. v. Trustees of Boston Univ., 679
 N.E.2d 191, 208 (Mass. 1997) (citation, internal quotation marks
 and alterations omitted). The statute does not specifically define
 "unfair" or "deceptive." See Ahern, 85 F.3d at 798 ("[T]he statute
 does not contemplate an overly precise standard of ethical or moral
 behavior. It is the standard of the commercial marketplace."
 (citation and internal quotation marks omitted)); Linkage Corp.,
 679 N.E.2d at 209 ("A practice is unfair if it is within the
 penumbra of some common-law, statutory, or other established
 concept of unfairness; is immoral, unethical, oppressive, or
 unscrupulous; and causes substantial injury to other businessmen."
 (citation, internal quotation marks and alterations omitted)).
 The courts of Massachusetts have consistently held that
 "conduct in disregard of known contractual arrangements and
 intended to secure benefits for the breaching party constitutes an
 unfair act or practice for c. 93A purposes." Anthony's Pier Four,
 Inc. v. HBC Assocs., 583 N.E.2d 806, 821 (Mass. 1991) (citation and
 internal quotation marks omitted). See Pepsi-Cola Metro. Bottling
 Co. v. Checkers, Inc., 754 F.2d 10, 17-19 (1st Cir. 1985) (Chapter
 93A violation found where payment withheld as a "wedge" to enhance
 bargaining power); Wang Labs., Inc. v. Business Incentives, Inc.,
 501 N.E.2d 1163 (Mass. 1986). Where one party to an agreement
 employs a breach of contract to gain an unfair advantage over the
 other, the breach "has an extortionate quality that gives it the
 rancid flavor of unfairness." Atkinson v. Rosenthal, 598 N.E.2d
 666, 670 (Mass. App. Ct. 1992) (citation omitted). Indeed, conduct
 largely equivalent to Dooyang's second act of deception has
 recently been held to violate Chapter 93A. See Community Builders,
 Inc. v. Indian Motocycle Assocs., Inc., 692 N.E.2d 964, 978 (Mass.
 App. Ct. 1998) (defendants "withheld payment unconscionably,
 stringing [plaintiff] along . . . with a purpose of coercing
 [plaintiff] to settle for substantially less compensation than the
 parties had agreed to before the services were performed").
 The district court's factual finding of unfair practices
 is clearly supported by the evidence. The court based its Chapter
 93A ruling both on testimony that Dooyang did not intend to pay ADL
 for the work it performed and on documents which stated that
 Dooyang was avoiding paying its creditors "by all possible means"
 and which created a mechanism for measuring the success of its
 strategy by listing the reductions that resulted from Dooyang's
 deceptive tactics. As the district court found, Dooyang intended
 to force ADL into an unfavorable settlement by threatening
 litigation. There was no error in the court's finding that the
 "second act of deception" amounted to an "unfair or deceptive act
 or practice" under Chapter 93A.
 Chapter 93A liability is decided case-by-case, and
 Massachusetts courts have consistently emphasized the "fact-
 specific nature of the inquiry." Linkage Corp., 679 N.E.2d at 209.
 We emphasize that this case did not involve a good faith dispute
 over billing or a simple breach of contract, each of which is an
 insufficient basis for 93A liability. See, e.g., Pepsi-Cola Metro.
 Bottling Co., 754 F.2d at 18 (stating that "mere breaches of
 contract, without more, do not violate [C]hapter 93A");
 Whitinsville Plaza, Inc. v. Kotseas, 390 N.E.2d 243, 251 (Mass.
 1979). This case is not like Quaker State Oil Ref. Corp. v.
 Garrity Oil Co., 884 F.2d 1510, 1513-14 (1st Cir. 1989), which held
 that refusal to pay an invoice without "more" was not enough to
 constitute a 93A violation. Here, Dooyang's wrongful purpose was
 to extract a favorable settlement from ADL for less than the amount
 Dooyang knew that it owed by repeatedly promising to pay, not doing
 so, stringing out the process, and forcing ADL to sue.
 These developments in Massachusetts law will require the
 Massachusetts courts to give greater definition and clarity to the
 parameters of 11 liability for those who do business in
 Massachusetts. Mere failure to pay a bill, standing alone, does
 not, it appears, give rise to such liability. See id. Where there
 is a good faith dispute over whether payment is actually owed, and
 that dispute is clearly articulated, it also appears there is no
 Chapter 93A liability. See id.; Levings v. Forbes & Wallace, Inc.,
 396 N.E.2d 149, 153 (Mass. App. Ct. 1979). Of course, due to the
 fact-specific nature of the Chapter 93A inquiry, generalizations
 are always somewhat indeterminate. See Cambridge Plating Co., 85
 F.3d at 769 ("Perhaps by design, the dimensions of Chapter 93A
 liability are difficult to discern with precision."). This case
 does not involve a mere failure to pay a bill, and the facts are
 sufficiently strong that we easily conclude they are actionable as
 "unfair or deceptive" under Chapter 93A. We leave to the
 development of state law where the lines will be drawn in these
 "the check is in the mail" type cases.
 2. Loss of Money or Property
 ADL had the burden of showing not only that the acts were
 unfair or deceptive, but also that it suffered a "loss of money or
 property" under Mass. Gen. Laws ch. 93A, 11. "'[M]oney' means
 money, not time, and . . . 'property' means the kind of property
 that is purchased or leased, not such intangibles as a right to a
 sense of security, to peace of mind, or to personal liberty." 
 Baldassari v. Public Fin. Trust, 337 N.E.2d 701, 709 (Mass. 1975). 
 And that loss of money or property must stem from Dooyang's
 misrepresentations regarding payment. See Lyle Richards Int'l,
 Ltd. v. Ashworth, 132 F.3d 111, 114-15 (1st Cir. 1997) (loss of
 money or property required under 11 must stem from deceptive
 act). It is the misrepresentations about payment which must have
 caused the loss because those misrepresentations, not the formation
 of the contract extension itself, took place in Massachusetts and
 so are subject to Chapter 93A. "[W]hether the requisite causal
 connection has been proven is one of fact" that will not be set
 aside unless clearly erroneous. DiMarzo v. American Mut. Ins. Co.,
 449 N.E.2d 1189, 1199 (Mass. 1983) (citation omitted).
 This requirement is satisfied by the combination of ADL's
 loss of the use of the money owed by Dooyang together with ADL's
 expenses incurred attempting to collect Dooyang's debt. While we
 have found no 11 cases directly on point, a number of cases under
 9 are helpful in the analysis. The closest 11 case is
 Community Builders, in which false promises to pay and delay caused
 a loss of use of money, attendant expenses, and caused plaintiff to
 continue to do work. Here plaintiff did not continue to do work
 and so the Appeals Court did not face the precise issue that we
 face.
 Massachusetts courts have held in 9 cases against
 insurers under Chapter 93A and Mass. Gen. Laws ch. 176D that the
 loss of the use of money owed to a plaintiff, once liability is
 "reasonably clear," is a form of damage compensable by Chapter 93A. 
 See Clegg v. Butler, 676 N.E.2d 1134, 1139 (Mass. 1997) (stating
 that "when an insurer wrongfully withholds funds from a claimant,
 it is depriving the claimant of the use of those funds" and so
 constitutes injury cognizable under Chapter 93A though the insurer
 eventually pays). Clegg reiterated the rule announced in Schwartzv. Rose, 643 N.E.2d 105, 109 (Mass. 1994), that the loss of the use
 of money "is precisely the type of damage we have described as
 appropriately being subject to multiplication . . . under c. 93A." 
 Schwartz was not a claim against an insurer under Chapter 176D, and
 so we take it that the Schwartz rule has general application, at
 least under 9.
 In 1979 the Massachusetts legislature amended Chapter 93A
 to eliminate the requirement of pleading a loss of money or
 property under 9. See Smith v. Caggiano, 421 N.E.2d 473, 475
 (Mass. App. Ct. 1981). Now, under 9, a plaintiff must prove that
 he or she has "been injured" by the defendant's unfair or deceptive
 practices. Mass Gen. Laws. ch. 93A, 9. One question is whether
 the cases under 9, which requires only a showing that plaintiff
 has "been injured," provide guidance on what is meant by "loss of
 money or property" under 11. The two phrases are not
 coextensive. "Injury" is a broader term, and includes, for
 example, emotional distress. See Leardi v. Brown, 474 N.E.2d 1094,
 1101 (Mass. 1985) (interpreting "injury" under 9 to include "an
 invasion of a legally protected interest, but no harm for which
 actual damages can be awarded"). But loss of money or property is
 certainly one form of injury. 
 We think the 9 cases provide guidance. In these 9
 cases, the court rejected arguments that the plaintiff suffered no
 injury because he suffered only a delay in payment rather than an
 absolute loss. Certainly, the loss of use of money, along with
 attendant collection and other expenses would seem to be both an
 "injury" under 9 and a "loss of money or property" under 11. 
 Cf. Caggiano, 421 N.E.2d at 476 ("'Money' means . . . 'money,' but
 its loss may occur short of physical transfer of legal tender.").
 In addition to the loss of the use of the money,
 Dooyang's unfair withholding of payment caused ADL to make
 expenditures to recover the money owed: long-distance phone calls
 and faxes to South Korea, and meetings with Dooyang executives. 
 Such expenditures have been found to satisfy the "loss of money or
 property" requirement. See Alcan Aluminum Corp. v. Carlton
 Aluminum of New England, 617 N.E.2d 1005, 1013 (Mass. App. Ct.
 1993) ("Carlton did suffer an actual loss of money or property --
 by responding to customer complaints and lawsuits about the
 defective siding . . . ."); Bump v. Robbins, 509 N.E.2d 12, 22
 (Mass. App. Ct. 1987) ("There is evidence of out-of-pocket
 expenditures for travel and long-distance telephone calls, time
 spent at meetings and in other related activities, and the usual
 charges Bump made for his time."); see also Baldassari, 337 N.E.2d
 at 709 (when plaintiffs suffered only emotional distress, no loss
 of money or property, but a different question would have been
 presented had plaintiffs suffered expenses). This combination of
 expenses and loss of use of money meant that ADL suffered a "loss
 of money or property" caused by Dooyang's second act of deception.
 A question remains about the proper measure of damages in
 this case. The district court doubled the breach of contract
 damages, but also ruled that Dooyang's initial act of deception was
 not covered by Chapter 93A. This theoretically could raise the
 issue of whether damages should be limited to only those damages
 caused by the second act of deception or whether 11 precludes
 such a measure of damages. Dooyang does not argue in its brief
 that the court's doubling of the entire amount of the underlying
 contract damages was error, but maintains only that there was no
 loss of money or property caused by the second deceptive act as
 required by 11. Dooyang's brief perfunctorily challenges the
 district court's decision to award double damages, but does not
 address the proper amount to be doubled. Dooyang has thus conceded
 the issue of the amount to be doubled, and we do not reach the
 theoretical issue. See King v. Town of Hanover, 116 F.3d 965, 970
 (1st Cir. 1997) (claims not argued on appeal are deemed waived).
 The district court awarded ADL double damages on the
 ground that Dooyang's misconduct was "willful and knowing." The
 district court clearly articulated its reasons for levying multiple
 damages, and we agree. See ADL II, 979 F. Supp. at 926-28. For
 the reasons stated in the opinion of the district court, we do not
 find the award of double damages based on Dooyang's willful
 deceptive acts to be excessive in this case.
 The judgment of the district court is affirmed. Costs
 are awarded to ADL.